UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

United States of America

v.

Crim. No. 2:18–cr–142

Jose Fontanez

## REPORT AND RECOMMENDATION
(Doc. 72)

Jose Fontanez, proceeding *pro se*, moves under 28 U.S.C. § 2255 to vacate, set aside, or correct his federal sentence, following his conviction of conspiracy to distribute 1 kilogram or more of heroin, 400 grams or more of fentanyl, and 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(l), 841(b)(l)(A), 841(b)(l)(B), and 846. (Docs. 70, 72.) Mr. Fontanez and the government entered into a plea agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C) that required a sentence of 120 months. (Doc. 54 at 5, ¶ 13.) On May 3, 2021, United States District Judge Christina Reiss sentenced Mr. Fontanez to 120 months' imprisonment, to be followed by a 5-year term of supervised release. (Minute Entry, ECF No. 69; Doc. 70.)

In his § 2255 Motion, Mr. Fontanez contends that the Court incorrectly calculated the drug quantity involved in his offense, which in his view was plain error. (Doc. 72 at 5.) Mr. Fontanez also asserts that he received ineffective assistance of counsel because his attorney, Brooks McArthur, Esq. allegedly (1) failed to share discovery, charging instruments, and the Presentence Report (PSR); (2) failed to challenge the court's application of Sentencing Guidelines enhancements; (3) failed to investigate the accuracy of the drug quantity applied under the Sentencing Guidelines and the corresponding converted drug weight (CDW) calculation; and (4) failed to appeal the conviction and sentence. (Docs. 72, 72-1.) Mr. Fontanez

requests vacatur of his plea and resentencing.  The government opposes Mr. Fontanez's Motion.  (Doc. 80.)

For the reasons set forth below, I recommend that Mr. Fontanez's § 2255 Motion (Doc. 72) be DENIED without a hearing.

### Factual and Procedural Background

### I.    Charge and Plea

On November 27, 2018, Mr. Fontanez was charged by Criminal Complaint with knowingly and intentionally attempting to aid and abet another person to possess with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(a)(1)(C), and 18 U.S.C. § 2. (Doc. 1.)  On December 13, 2018, an Indictment was returned charging Mr. Fontanez with one count of conspiracy to distribute heroin and 40 grams or more of fentanyl, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B); and one count of knowingly and intentionally attempting to aid and abet another person in the possession with intent to distribute heroin and fentanyl, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2.  (Doc. 11.)  On March 21, 2019, the grand jury returned a Superseding Indictment charging Mr. Fontanez with one count of conspiracy to distribute 1 kilogram or more of heroin, 40 grams or more of fentanyl, and 500 grams or more of cocaine; and one count of knowingly and intentionally attempting to aid and abet another person in the possession with intent to distribute heroin and fentanyl.  (Doc. 18.)  On August 27, 2020, the grand jury returned a Second Superseding Indictment charging Mr. Fontanez with one count of conspiracy to distribute 1 kilogram or more of heroin, 400 grams or more of fentanyl, and 500 grams or more of cocaine; and one count of knowingly and intentionally attempting to aid and abet another person in the possession with intent to distribute heroin and fentanyl.  (Doc. 48.)  The quantity of heroin and

fentanyl charged corresponded to a mandatory minimum term of imprisonment of ten years for each substance. *See* 21 U.S.C. § 841(b)(1)(A)(i) (heroin); 21 U.S.C. § 841(b)(1)(A)(vi) (fentanyl). The quantity of cocaine charged corresponded to a mandatory minimum term of five years' imprisonment. *See id.* § 841(b)(1)(B)(ii).

Mr. Fontanez pleaded guilty to Count One of the Second Superseding Indictment pursuant to a plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C). In relevant part, the plea agreement provided:

> JOSE FONTANEZ understands, agrees and has had explained to him by counsel that the Court may impose the following sentence on his plea: On Count One, up to life imprisonment, pursuant to 21 U.S.C. § 841(b)(l)(A); a 10-year mandatory minimum term of imprisonment, pursuant to 21 U.S.C. § 841(b)(l)(A); up to lifetime supervised release with a mandatory minimum of [5] years, pursuant to 21 U.S.C. § 841(b)(l)(A); up to a $10,000,000 fine, pursuant to 21 U.S.C. § 841(b)(l)(A); and a $100 special assessment.

(Doc. 54 at 1, ¶ 2.) Mr. Fontanez initialed each paragraph of the plea agreement, signaling his understanding of its terms. (*Id.*)

## II.    Presentence Report and Sentencing

The PSR applied a base offense level of 36 based on "a fair approximation of the drugs involved in the [approximately eight-year] conspiracy as well as relevant conduct." (PSR at 16, ¶ 52); s*ee* USSG § 2D1.1(c)(2). The PSR's estimation of relevant drug quantity derived from several sources: (1) testimonial evidence of co-conspirator ███████ as to quantities of heroin/fentanyl and cocaine he received from Mr. Fontanez; (2) law enforcement seizures of drugs associated with Mr. Fontanez, including substantial quantities of cocaine and heroin recovered during vehicle stops in 2016 and 2018; (3) fentanyl seized from Mr. Fontanez at the time of his 2018 arrest; and (4) fentanyl seized from a Hartford, Connecticut residence used by Mr. Fontanez. (PSR at 16–18, ¶ 52.) Combining these quantities with additional witness

testimony describing other substantial shipments of heroin on behalf of Mr. Fontanez, the PSR calculated that the offense involved at least 30,000 kilograms but less than 90,000 kilograms of CDW, resulting in base offense level 36.  (*Id*.)

The base offense level was increased two levels because Mr. Fontanez maintained a premises for the purposes of manufacturing or distributing a controlled substance.  (*Id*. at 19, ¶ 53); *see* USSG § 2D1.1(b)(12).  Because Mr. Fontanez committed the offense as part of a pattern of criminal conduct engaged in as his livelihood, the offense level was increased an additional two levels.  (PSR at 19–20, ¶ 53); *see* USSG § 2D1.1(b)(16)(E).  Mr. Fontanez also received a three-level role enhancement because he was a manager or supervisor of criminal activity involving five or more participants or was otherwise extensive.  (PSR at 20, ¶ 55); *see* USSG § 3B1.1(b).  The offense level was reduced three levels for his acceptance of responsibility for the offense.  (PSR at 21, ¶¶ 59–60); *see* USSG § 3E1.1.  The total offense level was 40.  (PSR at 21, ¶ 61.)  As Mr. Fontanez had no criminal history, the PSR assessed a criminal history category of I.  (*Id.* ¶¶ 63, 66.)  The advisory Guidelines sentencing range for a total offense level of 40 and a criminal history category of I was 292 to 365 months.  (*Id.* at 26, ¶ 97.)  The Rule 11(c)(1)(C) plea agreement provided that Mr. Fontanez should be sentenced to 120 months.  (PSR at 27, ¶ 98.)

At the May 3, 2021 sentencing hearing, Mr. Fontanez confirmed that he had read the PSR and had no objections to its content:

> [COURT]: Did you read the presentence report?
> [FONTANEZ]: Yes, I did, your Honor.
> [COURT]: And did you have an opportunity to review it with your attorney?
> [FONTANEZ]: Yes, I did, your Honor.
> [COURT]: Are there any factual errors in it?
> [FONTANEZ]: No, your Honor.

(Doc. 71 at 3:25–4:6.)  Mr. Fontanez also did not object to the Guidelines calculation contained in the PSR.  (*Id.* at 4:15–18.)  Judge Reiss accepted the parties' plea agreement, explaining:

> I think it's a lenient sentence, but it's a ten-year sentence, and that is not trivial.  It was all the things that you know it was: It was a longtime conspiracy with large drug quantities, intentional use of fentanyl to increase sales, and many aggravating factors, but Mr. Fontanez has no prior criminal history that counts, and ten years is a significant sentence from anybody's perspective . . . .

(*Id.* at 3:11–17.)  In considering the sentencing factors under 18 U.S.C. § 3553(a), Judge Reiss commented on the exceedingly serious nature of Mr. Fontanez's crime:

> In this case, this was a long-term conspiracy with large quantities of drugs.  There was an effort to increase purposefully the fentanyl amount in the drugs.  There was a concerted and successful effort to avoid detection and to let other people take the bigger risks associated with the conspiracy.  There was a lot of money in the conspiracy, and Mr. Fontanez was found—or seen with over $250,000 on more than one occasion by more than one person.  So this was a for-profit, preying upon addicts to make money that could have been made in a legitimate way, and there are more aggravating factors than there are mitigating factors.

(*Id.* at 14:22—15:7.)

The Court imposed the mandatory minimum ten-year term of imprisonment and a five-year term of supervised release, reasoning that the 292- to 365-months' Guidelines range did not "properly reflect this crime and this defendant."  (*Id.* at 15:16–17.)

Mr. Fontanez did not appeal.

## Discussion

## I.    Controlling Legal Standards

### A.    Legal Standards Governing 28 U.S.C. § 2255 Motions

A person serving a sentence in federal custody may seek to correct that sentence if (1) "the sentence was imposed in violation of the Constitution or laws of the United States," (2) "the court was without jurisdiction to impose such sentence," (3) "the sentence was in excess of the maximum authorized by law," or (4) the sentence "is otherwise subject to collateral

attack." 28 U.S.C. § 2255(a). Review under § 2255 is "narrowly limited in order to preserve the finality of criminal sentences and to effect the efficient allocation of judicial resources." *Graziano v. United States*, 83 F.3d 587, 590 (2d Cir. 1996) (internal quotation marks omitted). Generally, "claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice" or actual innocence. *Massaro v. United States*, 538 U.S. 500, 504 (2003); *United States v. Thorn*, 659 F.3d 227, 231 (2d Cir. 2011). A movant shows cause and prejudice where the "claimed error constituted a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (internal quotation marks omitted). However, "requiring a criminal defendant to bring ineffective-assistance-of-counsel claims on direct appeal does not promote these objectives," and therefore petitioners may raise ineffective-assistance-of-counsel claims for the first time in a § 2255 motion. *Massaro*, 538 U.S. at 504.

With respect to the factual basis for a court's conclusions, 28 U.S.C. § 2255 requires a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ." 28 U.S.C. § 2255(b). Courts may exercise discretion in making this determination. *See* Rule 8(a) of the Rules Governing Section 2255 Proceedings ("If the motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted.").[1]

---

[1] The materials submitted in this case include an Affidavit from Attorney McArthur and supporting contemporaneous correspondence, and relevant pleadings and transcripts of proceedings in this Court. Mr. Fontanez's filings include his Motion, a memorandum of law, medical records, several emails with Attorney McArthur, and the transcript of his sentencing hearing. After review of the relevant materials, the undersigned has determined that the record is sufficient to recommend a disposition on the § 2255 Motion without an evidentiary hearing. *See Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001) ("It was, therefore, within the district court's discretion to choose a middle road that avoided the delay, the needless expenditure of judicial resources, the burden on trial counsel and the government, and perhaps the encouragement of other prisoners to make similar baseless claims that would have resulted from a full testimonial hearing.").

B.      **Legal Standards Governing Ineffective Assistance of Counsel**

The Sixth Amendment guarantees criminal defendants the right to be "assisted by an attorney . . . who plays the role necessary to ensure that the trial is fair." *Strickland v. Washington*, 466 U.S. 668, 685 (1984). Critically, "the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). A defendant alleging ineffective assistance of counsel must demonstrate that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.

*Strickland* applies when a defendant challenges his or her guilty plea on habeas review. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). To establish deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689; *see also Raysor v. United States*, 647 F.3d 491, 495 (2d Cir. 2011). The determinative question is not whether counsel "deviated from best practices or most common custom," but whether the "representation amounted to incompetence under prevailing professional norms." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal quotation marks omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.

To establish that the attorney's allegedly deficient performance prejudiced the defendant in his decision to plead guilty, the defendant must show that "there is a reasonable probability

that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. The defendant must "convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010). In the context of sentencing, "the defendant must show a reasonable probability that, but for counsel's substandard performance, he would have received a less severe sentence." *Gonzales v. United States*, 722 F.3d 118, 130 (2d Cir. 2013). The Second Circuit "requires some objective evidence other than defendant's assertions to establish prejudice." *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003).

## II.    Mr. Fontanez's § 2255 Motion

### A.    The Court's calculation of the drug quantity involved in the crime of conviction was not plain error.

Mr. Fontanez contends that the Court committed plain error when it attributed to him a CDW equivalent of at least 30,000 kilograms but less than 90,000 kilograms. To make this argument, he focuses only on the quantities explicitly charged in the count of conviction, i.e., 1 kilogram of heroin, 400 grams of fentanyl, and 500 grams of cocaine, which he asserts correspond to a CDW of only between 4,400 and 13,700 kilograms. (Doc. 72-1 at 6–7.) This claim is without merit because: (1) it does not account for the significant relevant conduct evidence in the case pertaining to drug quantity; (2) relatedly, it appears to confuse the mandatory minimum quantities charged in the count of conviction with additional amounts permissibly considered under the Guidelines' relevant conduct provisions; and (3) even assuming the PSR's drug quantity calculation was incorrect, the crime of conviction by statute required a minimum sentence of ten years, which was the sentence he received. Therefore, any claimed error did not prejudice Mr. Fontanez because he could not have been sentenced to less than ten years in any event.

A sentencing court may consider uncharged conduct that was "part of the same course of conduct or common scheme or plan as the offense of conviction." *United States v. Martin*, 157 F.3d 46, 50 (2d Cir. 1998) (internal quotation marks omitted); USSG § 1B1.3(a)(2). Mr. Fontanez pleaded guilty to conspiracy to distribute 1 kilogram of heroin, 400 grams of fentanyl, and 500 grams of cocaine, requiring a minimum sentence of ten years. (Doc. 54.) As the PSR demonstrated, however, the drug quantity attributed to Mr. Fontanez over the course of the conspiracy was much more substantial than the quantities charged. (PSR at 16–18.) In calculating drug quantity, the PSR first considered the heroin and fentanyl that Mr. Fontanez supplied to ████████. (*Id.* at 16, ¶ 52.) ████ estimated that between 2015 and 2018 he initially received 2,000 bags of heroin every few weeks, then 3,000 bags of heroin every few weeks, and then 5,000 bags of heroin every few weeks. (*Id.*)[2] Therefore, the PSR calculated that Mr. Fontanez provided ████ with 3,740 grams of heroin between 2015 and 2018, or 3,740 kilograms of CDW. (*Id.* at 16–17.)

Mr. Fontanez also supplied ████ with cocaine from 2010 through 2015. (*Id.* at 17.) ████ stated that between 2010 and 2012 he received two ounces of cocaine from Mr. Fontanez every other week, resulting in approximately 1,360.8 grams of cocaine, or 272 kilograms of CDW. (*Id.*) Between 2012 and 2015, Mr. Fontanez provided ████ with nine ounces of cocaine per month, resulting in approximately 9,185.4 grams of cocaine, or 1,837 kilograms of CDW. (*Id.*) In total, the PSR estimated that Mr. Fontanez provided ████ with cocaine[3] and heroin corresponding to 5,849 kilograms of CDW. (*See id.*)

---

[2] Mr. Fontanez does not dispute the PSR's reliance on the Vermont Forensic Laboratory's estimation of the average weight of heroin in bags tested during the time of the conspiracy in this case. (PSR at 16, ¶ 52 n.2; Doc. 72-1 at 2.)

[3] The PSR noted that a drug ledger seized from the Hartford, Connecticut residence corroborated Mr. Fontanez's cocaine trafficking. (PSR at 17.)

The PSR also considered several law enforcement seizures of drugs associated with Mr. Fontanez's drug trafficking conspiracy. (*Id.* at 17–18.) In January 2016, Connecticut State Troopers unsuccessfully attempted a traffic stop of a car that Mr. Fontanez was driving. (*Id.* at 6, ¶¶ 12–13.) Mr. Fontanez eluded law enforcement, but during the pursuit a brick of cocaine was thrown from the car and later recovered by police. (*Id.*) The cocaine weighed 982 grams, or 196.4 kilograms of CDW. (*Id.* at 18.) On May 17, 2016, a traffic stop of a vehicle driven by Jose Adorno, who distributed drugs for Mr. Fontanez, resulted in the seizure of a backpack containing 12.65 kilograms of heroin, or approximately 12,000 kilograms of CDW. (*Id.* at 7, ¶ 18; *id.* at 18.) An October 9, 2018 traffic stop of a car driven by Mr. Fontanez resulted in the seizure of 8.86 grams of heroin, or 8.86 kilograms of CDW. (*Id.* at 8, ¶¶ 26, 30; *id.* at 18.) When Mr. Fontanez was arrested on November 26, 2018, law enforcement officers seized from him 34.64 grams of fentanyl, or 86.6 kilograms of CDW. (*Id.* at 17–18.) A search warrant executed the same day at the Hartford, Connecticut residence yielded 34.21 grams of fentanyl, or 85.4 kilograms of CDW. (*Id.*) These seizures resulted in 12,205.26 kilograms of CDW during the investigation of Mr. Fontanez's drug trafficking conspiracy. (*Id.* at 18.) Based on Caro's statements and the seized drugs, the PSR attributed to Mr. Fontanez 18,054 kilograms of CDW, corresponding to a base offense level of 34. (*Id.* at 17–18.)

The PSR also considered the statements of ▮▮▮▮▮▮▮, who advised that Adorno transported at least ten kilograms of heroin for Mr. Fontanez approximately twelve times. (*Id.* at 18.) The PSR noted that ▮▮▮▮▮ had previously provided different—though still very substantial—estimations of repeated kilogram-quantity trips. (*Id.*) Applying a conservative estimation of these large heroin shipments attributable to Mr. Fontanez, the PSR concluded that

the total drug quantity involved at least 30,000 kilograms but less than 90,000 kilograms of CDW, which corresponded to a base offense level of 36. (*Id.*)

Mr. Fontanez raised no objections at sentencing to the factual bases of the PSR's drug quantity calculations. In fact, he expressly stated to the Court that he had read the PSR, reviewed it with his attorney, and found no factual errors in it. (Doc. 71 at 3:25–4:6.) Nor has he contested these facts in his § 2255 Motion. Rather, he asserts in a conclusory manner that "[n]othing was placed in the record" to support the drug quantity calculation. (Doc. 72-1 at 7.) As the foregoing summary of the evidence demonstrates, this is simply not the case. Further, the PSR's inclusion of relevant conduct drug evidence, and the Court's consideration of such evidence, was not plain error. In any event, by law Mr. Fontanez could not have received a sentence that was less than ten years. Consequently, his claimed errors in the drug quantity calculation could not have resulted in a lesser sentence.

**B.    Mr. Fontanez cannot demonstrate ineffective assistance of counsel because Attorney McArthur's representation was objectively reasonable.**

Mr. Fontanez asserts that he received ineffective assistance of counsel from Attorney McArthur because:

> Attorney McArthur failed to challenge enhancements, failed to investigate the drug amount applied to [Mr. Fontanez], failed to object to the erroneous sentencing calculation and converted drug weight calculation, and gave [Fontanez] erroneous advice in order to induce a plea. The plea was not knowingly made, on the grounds of erroneous advice and miscalculations. [Fontanez] requests to withdraw his plea agreement. Attorney McArthur was also ineffective for failing to take a 18 U.S.C. § 3742 appeal. Counsel failed to share discovery and charging instruments with [Fontanez].

(Doc. 72 at 4) Mr. Fontanez further contends:

> There is no way that competent counsel would allow their client to be held accountable for any amount of drugs outside of the recovered amount, when the confidential source is being untruthful and his allegations are facially

11

exaggerated. . . . [Attorney] McArthur was constitutionally ineffective for failing to investigate the allegations made against his client.

(Doc. 72-1 at 2.)  Mr. Fontanez specifically asserts that his sentence was based in part on the uncorroborated and uncontested statements of a confidential informant.  (*Id.* at 3.)  Mr. Fontanez further claims he "was not allowed any copies of his discovery from [Attorney] McArthur, or a copy of his PSR," and thus "his plea and assertion in court that he had [gone] over the PSR was misleading, when in fact, [he] had taken his attorney's word that it was correct."  (*Id.* at 3–4.)

### 1.    Claim That Attorney McArthur Failed to Provide Mr. Fontanez with Discovery, Charging Instruments, and the PSR

Attorney McArthur's Affidavit and attached exhibits demonstrate that there is no merit to Mr. Fontanez's claim that his attorney did not provide him with relevant charging instruments, discovery, or the PSR.  Attorney McArthur attests that he met with Mr. Fontanez on November 27, 2018, the day of his initial appearance, and provided him with a copy of the criminal complaint and supporting affidavit.  (Doc. 77 at 1, ¶ 2.)  Attorney McArthur successfully argued for Mr. Fontanez's release at the detention hearing the next day, and met with Mr. Fontanez to discuss the Criminal Complaint and Affidavit.  (*Id.*)  On November 29, 2018, Attorney McArthur called Mr. Fontanez to inform him of the nature of the recently returned indictment.  (*Id* at 2, ¶ 2.)  Attorney McArthur emailed Mr. Fontanez a copy of the Indictment on December 13, 2018. (Doc. 11; Doc. 77 at 2, ¶ 2; Doc. 77-1, Exh. A.)  On December 18, 2018, Attorney McArthur sent Mr. Fontanez a letter enclosing another copy of the Indictment and a copy of the federal statutes related to the charges.  (Doc. 77 at 2, ¶ 2; Doc. 77-2, Exh. B.)  The letter explained the mandatory minimum and maximum penalties for the charged offenses.  (Doc. 77-2, Exh. B.)  It also advised Mr. Fontanez that the government's discovery production was forthcoming and explained the process for Mr. Fontanez to review it.  Specifically, Attorney McArthur informed

Mr. Fontanez that he would send him any discovery not subject to protective order, and would arrange for Mr. Fontanez to review any discovery subject to protective order at Attorney McArthur's office.  (*Id*.)  Attorney McArthur received initial discovery from the government on January 15, 2019, at which point he sent a letter to Mr. Fontanez with a copy of the discovery. (Doc. 77 at 2, ¶ 2; Doc. 77-3, Exh. C.)  Attorney McArthur advised that a portion of the discovery was subject to a protective order but was available for review at his office.  (*Id.*)  Over the course of the discovery process, Mr. Fontanez came to Attorney McArthur's office on January 24, 2019,[4] September 24, 2019,[5] and March 10, 2020 to review the additional discovery and speak with counsel about his case.  (Doc. 77 at 2–3, ¶ 2.)

On April 19, 2019, Attorney McArthur met with Mr. Fontanez prior to his arraignment and gave him a copy of the Superseding Indictment.  (Doc. 77 at 3.)  On August 31, 2020, Attorney McArthur spoke with Fontanez via telephone about the Second Superseding Indictment and sent him an email summarizing their conversation and attaching the Second Superseding Indictment.  (*Id.*; Doc. 77-7, Exh. G at 1.)  Attorney McArthur has also provided letters and emails to Mr. Fontanez dated August 12, 2019, June 4, 2020, July 8, 2020, July 16, 2020, and August 31, 2020.  The August 12, 2019 letter encloses a copy of Attorney McArthur's Motion to Suppress and the government's response.  (*See* Doc. 77-4, Exh. D.)  Attorney McArthur's June 4, 2020 letter explicitly states that it is intended "to continue to keep you informed of all the

---

[4]  Attorney McArthur attests that he met with Mr. Fontanez "for an extended period of time" on January 24, 2019 to review discovery.  (Doc. 77 at 2, ¶ 2.)  Mr. Fontanez also reviewed discovery alone in a conference room at the law office.  (*Id*.)  After that date, Attorney McArthur "communicated with Mr. Fontanez on multiple occasions to review and discuss discovery as [he] received it from the government."  (*Id*.)

[5]  In addition to reviewing discovery on September 24, 2019, Attorney McArthur informed Mr. Fontanez of other information obtained from federal prosecutors during a September 13, 2019 meeting, and further consulted with Mr. Fontanez about his review of recorded conversations related to a confidential informant.  (Doc. 77 at 2–3, ¶ 2.)

information I receive in your case and debrief regarding information provided to me by the Government." (*Id.* at 3.)

The June 4, 2020 letter to Mr. Fontanez comprehensively details the evidence the government intended to introduce at trial, which included testimony of ██████; drugs from the 2018 car stop of Mr. Fontanez in New Hampshire and evidence from three seized phones; the evidence linking Mr. Fontanez to the kilogram of cocaine thrown from the car in 2016; and evidence from phones, witnesses, and search warrants linking Mr. Fontanez to the car stop of Jose Adorno and the seizure of twelve kilograms of heroin. (*Id.* at 3–4.) Attorney McArthur also provided Mr. Fontanez a written estimate of how the Sentencing Guidelines would apply given the evidence known at the time of the letter. (*Id.* at 4.) Finally, Attorney McArthur sent Mr. Fontanez the draft PSR on December 28, 2020 (Doc. 77-8, Exh. H) and the final PSR on April 27, 2021 (Doc. 77-9, Exh. I). Attorney McArthur attests, and his Affidavit and attached exhibits confirm, that he regularly communicated with Mr. Fontanez by telephone and email "to discuss issues in the Presentence Report and any objections." (Doc. 77 at 4, ¶ 2.) In sum, Attorney McArthur credibly represents that "[he] shared all discovery with Mr. Fontanez, provided him with all charging instruments, and provided him with the PSR and thoroughly reviewed it with him prior to the sentencing." (*Id.*)

Mr. Fontanez's claim that his counsel was ineffective in not providing discovery, charging instruments, and the PSR is without merit.

### 2. Claim that Attorney McArthur Was Ineffective Because He Failed to Investigate Drug Quantity and Failed to Object to the CDW Calculation

Attorney McArthur attests that he "thoroughly investigated the accuracy of the drug quantity assessed by reviewing discovery provided, speaking with Mr. Fontanez, meeting with

the prosecutors to learn more about evidence related to the witnesses and drug quantity testimony and reviewing evidence that was in the Government's possession related to drug quantity." (*Id.* at 5, ¶ 4.)  Based on that review, he did "not believe that the 'converted drug weight' calculation and base offense level in the PSR were erroneous." (*Id.* ¶ 5.)  The record plainly refutes Mr. Fontanez's contention that Attorney McArthur "avoid[ed] the actual calculation for the relevant conduct drug weight, to induce a high plea agreement." (Doc. 72-1 at 4.)

The information included in the PSR amply substantiated the assessed drug quantity.  As explained above, the evidence consisted of the statements of ████████ and ████████████, five seizures of controlled substances associated with Mr. Fontanez, and cell phone evidence. Mr. Fontanez appears to focus his argument on the allegedly unreliable drug information received from confidential informant ████████. (*Id.* at 2–3.)  He specifically contends that the confidential informant's information was uncorroborated.  (*Id.*)  Attorney McArthur's June 4, 2020 letter to Mr. Fontanez squarely answers this claim.  The letter contains a paragraph summarizing his recent conversation with the prosecutors about the evidence derived from ███. Specific to Mr. Fontanez's claim that little was known about ███ and his information was uncorroborated, Attorney McArthur advised that there were controlled buys into ███; that ████ began working with law enforcement shortly after his arrest to target Mr. Fontanez; that ████ undercover work resulted in Mr. Fontanez's arrest and the receipt of evidence from a search warrant execution at Mr. Fontanez's property; that ████ was "working with the government for a significant period of time targeting [Mr. Fontanez]; and notably, that Attorney McArthur had information that "other witnesses residing in Vermont will corroborate ████ testimony." (Doc. 77-4, Exh. D at 3.)

Attorney McArthur regularly conveyed the government's plea offers to Mr. Fontanez. In July 2020, Attorney McArthur communicated to his client two plea offers from the government: one in which the parties would stipulate to eleven years' imprisonment, and a second offer in which the defense could argue for as little as ten years and the government could argue for twelve years. (Doc. 77-4, Exh. D at 8–9; Doc. 77-10, Exh. J at 1–4.) After Mr. Fontanez rejected these offers, in August 2020 Attorney McArthur communicated another plea offer with a binding sentencing range of 8 to 12 years. (Doc. 77-10, Exh. J at 5–6.) Mr. Fontanez rejected this plea offer as well. (*Id.* at 6.) According to Attorney McArthur, "Mr. Fontanez rejected two offers from the government to resolve his case, and directed me to continue to negotiate a sentence of 10 year[s] in jail[,] which was the mandatory minimum sentence for the charged conduct and significantly below the guidelines. I was successful in negotiating the requested sentence." (Doc. 77 at 6.)

When the Court inquired about the parties' agreement to a relatively lenient ten-year sentence notwithstanding the substantially higher Guidelines range, the government acknowledged that "this is a sentence that is well below the guidelines imprisonment range, and were it not for COVID-19 and the effect that it had on the ability of the Government to prove its case at trial, perhaps this is not an agreement we would have reached, but . . . we do think that it is just and appropriate." (Doc. 71 at 11:9–17.) In other words, although Mr. Fontanez was subject to an exceedingly elevated Guidelines range at sentencing—driven in large part by the very substantial drug quantities attributed to him—Attorney McArthur's advocacy resulted in a binding Rule 11(c)(1)(C) agreement to the lowest possible sentence for the crime of conviction. The ten-year sentence was approximately fourteen years below the low end of the advisory Guidelines range. Contrary to Mr. Fontanez's claim that his attorney "avoid[ed] the actual

calculation for the relevant conduct drug weight, to induce a high plea agreement" (Doc. 72-1 at 4), notwithstanding the drug weight evidence amply supporting the Guidelines range of 24 to 30 years, his attorney achieved the lowest possible sentence available under the law.

Attorney McArthur's consideration of the drug quantity evidence was well within the bounds of reasonable professional assistance.

### 3.     Claim that Attorney McArthur Was Ineffective Because He Did Not Challenge Enhancements Under the Sentencing Guidelines

The PSR applied a two-level enhancement based on the conclusion that Mr. Fontanez's offense conduct was part of a pattern of criminal conduct engaged in as a livelihood. (PSR at 19–20, ¶ 53); *see* USSG § 2D1.1(b)(16)(E). The PSR also applied a three-level enhancement because it determined that Mr. Fontanez conducted himself as a manager or supervisor in criminal activity involving five or more participants. (PSR at 20, ¶ 55); *see* USSG § 3B1.1(b). According to Mr. Fontanez, "[t]he court concluded that a livelihood enhancement applied and placed no facts on the record to support this finding." (Doc. 72-1 at 7.) He further claims that "[n]othing in this case corroborates [him] making more than 2,000 times minimum wage," which is a reference to the standard used to determine whether a defendant engaged in the criminal conduct as his livelihood. (*Id.*); *see* USSG § 4B1.3 application note 2. As to the role enhancement for serving as a manager or supervisor, Mr. Fontanez contends that there was no evidence in the record demonstrating that the criminal activity involved five or more participants. (Doc. 72-1 at 7–8.) Therefore, he faults Attorney McArthur for not challenging these enhancements at sentencing.

Attorney McArthur responds that he did not challenge the inclusion of the enhancements because he "thoroughly reviewed the discovery [he] was provided and further information provided by the Government and came to the conclusion based on the evidence that the

Government could meet its burden proving the two enhancements [for role in the offense and criminal livelihood]." (Doc. 77 at 5, ¶ 3.) To Mr. Fontanez's charge that his attorney did not adequately engage in an analysis of sentencing enhancements generally, Attorney McArthur notes that in fact his investigation of potential enhancements resulted in the removal of the dangerous weapon enhancement from the final PSR. (*Id.*)

Independent consideration of the sentencing enhancements establishes that Attorney McArthur was reasonable in electing not to challenge them. With respect to the role adjustment, the Guidelines permit a three-level enhancement where the defendant "was a manager or supervisor . . . and the criminal activity involved five or more participants or was otherwise extensive." USSG § 3B1.1(b). The PSR applied this enhancement because the evidence demonstrated that:

> [Mr.] Fontanez's drug enterprise was extensive and involved multiple people. [Mr.] Fontanez's drug operation spanned three states, had other managerial members from Puerto Rico and New York, and involved mass quantities. [Testimonial evidence established that] [Mr.] Fontanez directed individuals to send money, drive to Vermont, and transport drugs.

(PSR at 20, ¶ 55.) The PSR also noted that Mr. Fontanez's count of conviction explicitly referenced his managerial role: "During the conspiracy JOSE FONTANEZ utilized his co-conspirators in a variety of ways, including assisting him with acquiring controlled substances, packaging controlled substances for re-distribution, and distributing controlled substances. These co-conspirators were located in Connecticut, Vermont, Maine, and elsewhere." (PSR at 4, ¶ 7; *id.* at 20, ¶ 55.) As these facts clearly supported the role enhancement, Attorney McArthur exercised reasonable professional judgment in not challenging its application.

In order for the "criminal livelihood" enhancement to apply, it must be shown that "[t]he defendant committed the offense as part of a pattern of criminal conduct engaged in as a

livelihood." USSG § 2D1.1(b)(16)(E). The Guidelines define a "pattern of criminal conduct" as "planned criminal acts occurring over a substantial period of time." *Id.* § 4B1.3 cmt. n.1. A defendant "engages in criminal conduct as a livelihood" if he:

> derived income from the pattern of criminal conduct that in any twelve-month period exceeded 2,000 times the then existing hourly minimum wage under federal law [and] the totality of circumstances shows that such criminal conduct was the defendant's primary occupation in that twelve-month period (e.g., the defendant engaged in criminal conduct rather than regular, legitimate employment; or the defendant's legitimate employment was merely a front for the defendant's criminal conduct).

*Id.* cmt. n.2. The PSR applied this enhancement based on the fact that the count of conviction charged Mr. Fontanez with a drug conspiracy that spanned at least eight years and that notwithstanding his employment at Bradley International Airport in Connecticut, witnesses stated that Mr. Fontanez supported himself largely through drug distribution. Two witnesses provided information that Mr. Fontanez possessed "large amounts of cash," including "$250,000 on a few occasions." (PSR at 20, ¶ 53.) The drug quantity assessed at sentencing is also indicative of substantial income from drug sales. As these facts clearly supported the criminal livelihood enhancement, Attorney McArthur exercised reasonable professional judgment in not challenging its application. Again, not only did Mr. Fontanez advise the Court at sentencing that the PSR was accurate, but any claimed error in the application of these enhancements would not have altered the sentence he received. Even had he successfully challenged the enhancements, he would have received the same 120-month sentence.

### 4.    Claim that Attorney McArthur Was Ineffective Because He Did not Appeal Mr. Fontanez's Sentence

Mr. Fontanez asserts that Attorney McArthur rendered ineffective assistance of counsel because he "fail[ed] to take a 18 U.S.C. § 3742 appeal" and generally failed to communicate

with him.  (Doc. 72 at 4; Doc. 72-1 at 5.)  He states that he "repeatedly" asked his attorney

"about an appeal."  (Doc. 72-1 at 4.)

Attorney McArthur notes that he "spoke with Mr. Fontanez immediately after the

sentencing and several more times by telephone prior to his report date.  At no time did he ever

request an appeal."  (Doc. 77 at 6, ¶ 6.)  He further attests: "Mr. Fontanez never implicitly or

expressly requested or directed me to appeal his sentence.  Had Mr. Fontanez ever raised the

issue of appealing his sentence with me, I would have immediately filed a notice of appeal.  He

never did." (*Id.* at 5–6, ¶ 6.)  Attorney McArthur confirms that he reviewed his past

correspondence with his client after Mr. Fontanez filed the § 2255 Motion.  He states that this

correspondence did not include any requests from his client to appeal the sentence.  (*Id.* at 7,

¶ 6.)  Attorney McArthur's representations on this issue credibly demonstrate that no such

request for an appeal was ever received.  The exhibits attached to the Affidavit document

Attorney McArthur's regular correspondence post-sentencing with Mr. Fontanez, Mr. Fontanez's

wife, the Office of the Federal Public Defender, and Fort Dix, the facility where Mr. Fontanez

was serving his sentence.  The correspondence addressed a variety of matters, including

Mr. Fontanez's request to transfer facilities; his request for assistance addressing the conditions

of his confinement at Fort Dix; and his request for the transcript of his sentencing hearing.

(Docs. 77-12, Exh. L; Doc. 77-13, Exh. M; Doc. 77-14, Exh. N.)  Mr. Fontanez did not request

that Attorney McArthur file an appeal in any of the correspondence.[6]

---

[6] Mr. Fontanez also attaches five emails with Attorney McArthur dating to 2022.  (Doc. 72-3.)  These
emails pertain to (1) Mr. Fontanez's request for clarification regarding the basis for the total offense level assessed at
his sentencing; (2) Mr. Fontanez expressing his gratitude to Attorney McArthur for apparently assisting in Mr.
Fontanez's transfer from Fort Dix to the correctional institution in Danbury, Connecticut; and (3) Mr. Fontanez's
request to amend the PSR to ensure his eligibility for the RDAP program.  Mr. Fontanez does not address the appeal
of his sentence in any of these emails.

In sum, Mr. Fontanez offers no evidence to substantiate his claim that Attorney McArthur disregarded his request to file an appeal or otherwise failed to communicate with him. Without any objective supporting evidence, Mr. Fontanez's assertions alone are insufficient to establish ineffective assistance of counsel on this ground.

<u>**Conclusion**</u>

For the reasons explained above, I recommend that Mr. Fontanez's § 2255 Motion (Doc. 72) be DENIED.

Because the Motion and other files and records in this case "conclusively show that [he] is entitled to no relief," I also recommend that an evidentiary hearing on the motion is not necessary. 28 U.S.C. § 2255(b). I further recommend that the Court decline to issue a certificate of appealability because Mr. Fontanez has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Generally, a movant meets this burden by demonstrating that "reasonable jurists could debate whether . . . the [motion] should have been resolved in a different manner or that the issues presented [a]re adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). As the above analysis of Mr. Fontanez's claims demonstrates, a certificate of appealability should be denied because he has not made a substantial showing of the denial of a constitutional right.

Dated at Burlington, in the District of Vermont, this 25th day of July 2023.

*/s/ Kevin J. Doyle*
Kevin J. Doyle
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections that shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) (quoting *Small v. Sec'y of Health & Hum. Servs.*, 892 F.2d 15, 16 (2d Cir. 1989)).